*FOR PUBLICATION*

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS AND ST. JOHN

APPELLATE DIVISION

| | |
|---|---|
| PEDRO HARRIS, | ) D.C. App. Crim. No. 1998-0157 |
| | ) |
| Appellant, | ) |
| vs. | ) Super. Ct. Crim. No. F1/1996 |
| | ) |
| GOV'T OF THE VIRGIN ISLANDS, | ) |
| | ) |
| Appellee. | ) |
| _____ | ) |

On Appeal from the Superior Court of the Virgin Islands,
The Honorable Ishmael A. Meyers, Judge Presiding

Considered: January 22, 2010
Filed: September 16, 2011

BEFORE: **RAYMOND L. FINCH,** Senior Sitting Judge of the District
Court of the Virgin Islands; **LEGROME D. DAVIS,** Judge of the
District Court, Eastern District of Pennsylvania, sitting by
designation; and **PATRICIA D. STEELE,** Judge of the Superior
Court, Division of St. Croix, sitting by designation.


**Attorneys:**

**Claudette V. Ferron, Esq.**
St. Thomas, U.S.V.I.
        For the Appellant,

**Maureen Cormier, Esq. AAG**
**Elliot M. Davis, Esq. AAG**
**Pamela Tepper, Esq. AAG**
St. Thomas, U.S.V.I.
        For the Appellee.

---

### MEMORANDUM OPINION

---

**DAVIS, J.** delivers the opinion of the Court.

In 1996, a jury convicted five men of a murder that only four committed. Appellant Pedro Harris was the odd man out. The verdict against Harris rested upon a surprise identification during the trial by a witness that has since recanted. Though the prosecutor knew, or should have known, that the identification lacked credibility, he relied on it blindly in pursuit of a conviction. Harris remains incarcerated, without having received a new trial, because the trial court failed to adequately review the witness's credibility and committed legal error when it determined that the witness's recantation was not enough to merit a new trial. Because of the individual and aggregate effect of these plain errors, we vacate the judgment of conviction of the territorial court and remand for a new trial.

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

At approximately midnight on March 26, 1994, Police Officer Steven Hodge died outside his home in Lindbergh Bay, St. Thomas,

---

[1] Although the trial spanned two weeks and featured testimony from a plethora of witnesses, the facts presented here include only those necessary to our disposition of Harris's appeal.

after sustaining gunshot wounds from four different guns.

(Trial Tr. vol. 3, 61:17, Aug. 8, 1996.)  According to witness

Eustace Sorhaindo, four men dressed in black walked up the road

in the direction of Hodge's home right before the gunfire began.

(Trial Tr. vol. 2, 24:6-24:19, 25:10-26:18, 27:4, Aug 7, 1996.)

Shorn Pennyfeather, a neighbor of Officer Hodge, confirmed that,

just after hearing gunshots, four men dressed in all black with

hoods covering their heads ran down the street. (Trial Tr. vol.

1, 199:6-199:10, 200:4-200:15, 208:6-208:12.)  The Government of

the Virgin Islands prosecuted five men for the murder: Gent

Mosby, William Vanterpool, Carlos Fleming, Maurice Richardson,

and Appellant Pedro Harris.[2]

Early in the investigation, Sorhaindo identified Mosby, and

only Mosby, from a photographic array.  (Trial Tr. vol. 2,

35:12-39:5.)  Although also presented with Harris's photograph,

Sorhaindo did not identify Harris as one of the men he saw in

Lindbergh Bay the night of the murder.  (Trial Tr. vol. 6,

232:20-233:10, Aug. 13, 1996.)

Without an identification, the Government sought to convict

Harris using only the testimony of Vincent Daniel.  According to

---

[2] The trial occurred in the Territorial Court of the Virgin Islands.
The name of that court has since been changed to the Superior Court of
the Virgin Islands.  *See* Act of Oct. 29, 2004, No. 6687, sec. 6, § 2,
2004 V.I. Legis. 6687 (2004).  To avoid any confusion, we refer to
that court as the trial or lower court.

Daniel, Harris was present at the clothing store owned by co-defendant Mosby at approximately 5:00 p.m. on the day of the murder. (Trial Tr. vol. 4, 36:14-39:2, Aug. 9, 1996.) Daniel testified that Harris and Vanterpool were in the bathroom when he heard a click coming from that direction. (*Id.* at 39:3-39:14.) Daniel further testified that, the click "might have been the sound of a gun," but it "might have been the sound of anything." (*Id.* at 39:24-40:3.) Another witness, Gwentin Sellwood, testified that when he visited the store that same day, he heard Mosby tell Vanterpool and Fleming that "[he] was going to pick them up later about 11:30. They have a serious job to do . . . ." (*Id.* at 67:8-67:11.) But no evidence was presented that Harris ever exited the bathroom (*see id.* at 41:6-41:14), or otherwise participated in the conspiratorial discussions led by Mosby (*see id.* at 66:2-66:4 (stating that Mosby, Vanterpool, and Flemming were in the store during the "serious job" discussion)).

Throughout the pretrial proceedings, Prosecutor John Davis represented that the government would present a sole identification of one of the men who walked down the darkened road to Officer Hodge's home——Eustace Sorhaindo's identification of Gent Mosby. (Pretrial Hr'g Tr., 25:4-25:17, Jul. 18, 1996.) Davis foreshadowed the single expected identification in his

opening statement, describing the testimony to come: "Mr.

Sorhaindo recognized Gent Mosby as being one of those men that

walked past him that night and picked him out in that

photographic array dressed in all black as he passed him in that

first group of two." (Trial Tr. vol. 1, 81:9-81:13, Aug. 6,

1996.) Harris's lawyer, Richard Farrelly, grounded his defense

strategy on the fact that no one had ever, or would ever,

identify his client. (*Id.* at 161:11-161:13.)

When Sorhaindo took the stand, he surprised the trial's

participants by identifying Harris as the person he saw, instead

of Mosby. (Trial. Tr. vol. 2, 27:20-29:8.) Prosecutor Davis

sought to verify this unexpected testimony by making Sorhaindo

approach the defense table to make the identification at closer

range. (*Id.*) When given a chance to walk around to make a

second inspection of everyone present and asked if he recognized

anyone else, Sorhaindo responded, "No, sir. I don't." (*Id.* at

30:21-30:24.) But since Sorhaindo's pre-trial identification of

Mosby played a central role in the case against Mosby, the ring

leader, Davis pressed on, soliciting testimony from Sorhaindo

that he had, in fact, positively identified Mosby in a photo

array the year before. (*Id.* at 32:22-37:13) Sorhaindo then

acknowledged that the man he picked out of the photo array was

in fact the same Gent Mosby seated at the defense table. (*Id.*
at 37:15-39:5.)

At trial, Sorhaindo admitted that on the morning of March 27,
1994 he told local police that he did not see the faces of the
four men that passed him the night before and was unable to give
a description of the men. (Trial Tr. vol. 2, 53:17-53:19,
56:10-56:13.) When he spoke to police that same afternoon,
Sorhaindo "came up with a description." (*Id.* at 56:14-56:16.)
But that description——of two men around 6' tall, both dark-
skinned, and of two men around 5'-6" tall, one light skinned and
one of small build with dark skin——differed markedly from the
description that he provided to the FBI almost a month later.
(*Id.* at 56:17-57:14.) In an April 1996 interview, he told the
FBI that two of the men were approximately 6'2", that one was
6", and that the shorter man was stocky. (*Id.* at 63:4-63:21.)
To the FBI, he recounted that Lionel Parsons tapped him on the
shoulder to alert him to the presence of the four men,
interrupting a game of dominos. (*Id.* at 71:23-73:16.) But at
trial, Sorhaindo told the jury that his brother, Alexis White,
pointed out the four men to Sorhaindo while he was locking up
the door of his church following a social event. (*Id.* at 26:1-
26:18.) Sorhaindo's first three statements were consistent in

only one respect: he did not see the men's faces.[3] (*Id.* at

65:14-65:18.) Nonetheless, when shown a photo array a year and

three months after the shooting, he identified Mosby (*Id.* at

37:15-39:5), and more than a year later made the surprise in-

court identification of appellant Pedro Harris. (*Id.* at 27:20-

29:8.)

Outside the presence of the jury, Farrelly asked for a

brief recess before he cross-examined Sorhaindo because

Sorhaindo's identification of Harris was "totally surprising."

(Trial Tr. vol. 2, 51:2-51:11.) The judge denied his request.

(*Id.*) At the lunch recess, Farrelly moved to strike the

identification on the grounds that Davis had violated pre-trial

discovery rules by failing to disclose that Sorhaindo would

identify Harris at trial and that the identification procedure

used was overly suggestive. (*Id.* at 195:20-196:3.) As for the

alleged discovery violation, the judge "suggest[ed] that [Davis]

w[as] just as surprised." (*Id.* at 198:18-198:19.) Davis

admitted, "I was just as surprised as this guy." (*Id.* at

---

[3] At trial, Sorhaindo denied telling the FBI that the reason he could
not see the men's faces was that the men wore stockings over their
heads, even though counsel's questions indicated that the FBI report
so reflected. Sorhaindo said he could not recall what he told the FBI
but he was certain that only one of the men wore stockings over his
head. (Trial Tr. vol. 2, 67:14-18.) During testimony taken in 2001,
Sorhaindo admitted that he told the FBI that all four men had
stockings over their faces. (Hr'g Tr., 50:9-50:18, June 28, 2001.)

198:20-198:21.)  The judge declined to rule on the
identification's admissibility, though, saying "I don't know
what the answer is.  I'm simply being honest. . . . I am going
to have one of my law clerks research the issue as to what
happens when a witness never previously identified a person and
then he makes an in-court identification." (*Id.* at 197:8-
197:17.)  He also asked that Farrelly have one of his associates
research the issue and report back to him.  (*Id.* at 196:22-
196:24.)

But the trial record lacks any further discussion of the
legal effect of this in-court identification.  And rather than
abandon Sorhaindo's unexpected and suspect identification of
Harris, Davis changed trial strategy and explicitly relied on
the identification in closing.  (Trial Tr. vol. 9, 25:8-25:23.)
Urging the jury to find Harris guilty of murder, he recalled
that Sorhaindo "pick[ed] out Pedro Harris as one of the four men
that walked slowly by him the night of the murder.  Pedro
Harris.  Pedro Harris." (*Id.* at 25:20-25:24.)

The jury found Harris guilty of conspiracy to commit murder
and murder in the first degree.  Harris moved for an acquittal
or for a new trial, but the trial judge denied both remedies.

Evidence shrouding Harris's conviction with uncertainty
promptly surfaced post-trial.  Nearly two years would pass

before the trial judge eventually sentenced Harris, and he did

so only hesitantly while citing a need for "closure."

(Sentencing Tr. vol. III, 15:12, June 18, 1998.)  In November

1996, at the first of three sentencing proceedings, Harris

brought two letters, written by Carlos Fleming, a convicted co-

defendant, to the judge's attention.  The letters attested to

Harris's innocence and inculpated Fleming, Mosby, Richardson,

and a fourth man in the murder.  At first, Fleming denied

writing them (Sentencing Tr. vol. I, 50:23-51:4, Nov. 15, 1996),

but later admitted writing the letters and divulged where he had

disposed of the guns.[4]  (Sentencing Tr. vol. II, 31:18-31:21,

34:20-34:25, Nov. 21, 1997.)  When the trial judge asked Harris

whether he had anything to say, Harris made these remarks:

> DEFENDANT HARRIS: Since September 14, whenever it was,
> I was arrested for something I didn't know about and
> found guilty for a charge I don't know nothing about.
> During the trial, while I was in lockdown, Carlos
> Fleming came to me and told me about these same
> letters, but he said it during the deliberations part
> . . . , the Saturday morning, when we were in lockdown
> cell back there.  Carlos come to me and tell me what
> about the Steven Hodge incident, who all were involved
> and who did what and who did which.

---

[4] In 2001, when his own criminal appeal was pending (see D.C. Crim.
App. No. 97-17), Carlos Fleming denied writing the letters for a
second time.  (Hr'g Tr., 108:12-111:10, June 28, 2001.).  Because a
sufficiency of the evidence challenge formed the basis for his appeal,
admitting that he penned the letters would have gutted his chances to
overturn his convictions, and we give his 2001 testimony little weight
as a result.  Fleming voluntarily dismissed his appeal in 2009.

THE COURT:  He told you who all were involved?

DEFENDANT HARRIS: Yeah.

THE COURT: Did he tell you how he knew?

DEFENDANT HARRIS: He was one of them.  He told me he
was the one with the rifle. . . .  And Mosby was the
one with the .380 gun, and a guy name [] was the one
with the 9mm, and Maurice Richardson was the one with
the shot gun. . . . I don't know how I get involved in
the whole incident.  All I know, I was fighting for my
life during the whole trial for something I didn't - -
I didn't have no idea about. . . . Now I'm going to
receive the maximum of life in prison without parole
for a crime I have no complete idea about . . . .

THE COURT: Well, why didn't you communicate this
information to your lawyer?

DEFENDANT HARRIS: Because Carlos then tell me that he
going to clear my name.  That's why he wrote the
letters, the two letters, to clear my name.  Because
he know I ain't had nothing to do with it.

(Sentencing Tr. vol. I, 58:25-62:2.)  Finding Harris's testimony

credible enough to investigate, the judge postponed sentencing

so that Farrelly and Davis could evaluate Harris' version of

events.  (*Id.* at 70:1-70:14.)

Twelve months later, when Harris appeared at his second

sentencing hearing, neither Farrelly nor Davis's replacement,

Angela Garner, had made any progress, seemingly for lack of

effort.  When asked by the Court what he had done in the year

since Harris's first sentencing proceeding, Farrelly admitted

that he had only waited for the government to hand over whatever

report their investigation produced.  (Sentencing Tr. vol. II,

10:15-12:19.)  Davis testified, and Garner's statements

corroborate, that the Government had abandoned its investigation

when Davis was removed from office.  (*Id.* at 29:25-32:10, 18:21-

20:6.)  With the support of Davis, who appeared as a witness,

Farrelly urged the judge to grant an evidentiary hearing so that

Fleming could testify on Harris's behalf.  (*Id.* at 7:7-8:18)

Garner opposed the hearing on the grounds that anything Harris

or other witnesses might testify to could have been raised at

trial.  (*Id.* at 15:6-16:5.)  She argued that a jury verdict may

be set aside "only [] if there is insufficient evidence to

substantiate the conviction," a circumstance she deemed not

present in this case.[5]  (*Id.* at 16:21-16:24.)  Calling a hearing

"useless," she asked the judge to sentence Harris to life

without parole.  (*Id.* at 17:22-18:16.)  Yet, remarkably, in the

same breath, she lamented that an innocent man might go to

prison:

> It is really indeed a tragedy to have to come here to
> have to sentence this defendant for life without the

_____

[5] Garner misstated the law, exhibiting her confusion between the trial
court's authority to grant an acquittal and its authority to grant a
new trial.  *Compare* Fed. R. Crim. P. 29; *with* Fed. R. Crim. P. 33.
Many valid grounds other than insufficient evidence exist for granting
a motion for a new trial.  Federal Rule of Criminal Procedure 33 gives
courts discretion to grant new trials if "the interests of justice so
require."  Thus, for example, the Third Circuit has held that newly
discovered evidence or evidence of prosecutorial misconduct may
suffice to warrant a new trial.  *United States v. Iannelli*, 528 F.2d
1290, 1292 (3d Cir. 1976) (newly discovered evidence); *United States
v. Dixon*, 658 F.2d 181, 193 (3d Cir. 1981) (prosecutorial misconduct).

possibility of parole for a crime he claims, and . . . that Carlos Fleming claims, Pedro Harris did not do. *However what can the prosecution do at this time? What can the trial court do at this time?*

(*Id.* at 14:22-15:5)(emphasis added).

The trial court denied Harris's motion for a new trial, stating that a co-defendant's post-trial statement did not qualify as newly discovered evidence and that to allow a co-defendant to exonerate another defendant once the co-defendant has nothing to lose would encourage perjury. (Sentencing Tr. II, 37:4-41:25.) This exchange followed:

THE COURT: So is there any legal cause why sentencing should not proceed at this time?

ATTORNEY FARRELLY: Your Honor, my objection is on the record that I wanted that hearing. But are you telling me there is no remedy?

THE COURT: I beg your pardon?

ATTORNEY FARRELLY: You're saying there is no remedy for this, so you mean we are going to sentence him today to life without parole?

THE COURT: Is there any legal cause from the Government?

ATTORNEY GARNER: No, Your Honor.

THE COURT: All right. Mr. Farrelly is there anything you would like to say on behalf of the defendant?

ATTORNEY FARRELLY: No, Your Honor.

THE COURT: Nothing at all?

ATTORNEY FARRELLY: No, Your Honor.

(*Id.* at 48:20-49:20.)

Despite the judge's intention to move forward, Harris's comments persuaded him to postpone sentencing for a second time so that an investigation could occur. Because we, like the trial court, find this testimony compelling, we set it forth here in some detail:

> DEFENDANT HARRIS: Honestly, I don't believe this is going to happen to me, because I haven't done anything to be convicted of any crime. All I done that night the crime took place is, I only went to a party. And you sat here and heard my witness say on the stand, and she testify saying she seen me at the party.
>
> I didn't go no where where [Sorhaindo] claim he seen me. I wasn't no where near there. So what is happening to me at this present time, I don't think is fair, because I haven't done anything against no one. I haven't committed a crime; I haven't done anything. To take away my life for something I didn't do and didn't know about, is really unjust. I didn't do anything to say serve six months in jail much less to say I doing a life time in jail.

(Sentencing Tr. vol. II, 50:7-51:2.) He provided more details about spending the evening at the party with two others and postulated that his basketball tattoo, which matched Vanterpool's, might be the reason the police suspected him. (*Id.* at 51:16-53:10.) When asked by the judge why he didn't take the stand, Harris stated, "I was advised that it ain't had no reason for me to take the stand because I didn't do nothing." (*Id.* at 54:4-54:7.) He continued:

> All I used to do on the street is stay home, play basketball and deal with my animals. I didn't have nothing against nobody to say I am going to commit any

> kind of crime. Now, to say today, November 21, I'll
> get natural life for something I didn't know about,
> honest to God, I didn't know anything about that. I
> am getting convicted for what somebody else did
> because we were friends, and I don't think that was
> fair.

(*Id.* at 54:23-55:8.) Harris's testimony underscored the gravity

of Sorhaindo's mistake:

> Only time something was said about me was the
> misidentification . . . . [Sorhaindo] was supposed to
> identify Mosby through the picture array, and that's
> when he identified Mosby as someone he saw. I was not
> identified, and that's why I didn't take the stand and
> I didn't have anything to do with it but going to a
> party and that's it.

(*Id.* at 56:11-56:25.) In a moment of seeming introspection, he

said:

> If you call fighting chicken a criminal act, then
> that's the only crime I know I am guilty of because I
> like doing that. That's the only thing I use to do on
> the street containing violence, chicken fighting.
> That was it. To say I'll kill somebody, that's not
> me. For what reason would I want to take a next man's
> life? I have no reason to do such a thing, and I
> won't want to do such a thing.
>
> Now to say today I getting convicted of natural life
> for absolutely no reason on my behalf, that's not
> justice. I am not saying they didn't commit the
> crime, I can't speak for [no] one. But I know I
> didn't commit the crime. All I know, I was wrongfully
> arrested, wrongfully convicted and now I will be
> wrongfully sentenced for something I didn't do.

(*Id.* at 77:10-78:5.)

As had happened the year before, the judge found Harris

credible and compelling, and withheld the imposition of his

sentence, giving the parties two more months to address the

serious concerns raised as to the validity of Harris's

conviction. (Sentencing Tr. vol. II, 106:21-107:5.) Yet even

in light of Harris's potent testimony, Garner opposed the

extension:

> ATTORNEY GARNER: *I don't see the need for it*, Your
> Honor.
>
> THE COURT: You don't see the need for it?
>
> ATTORNEY GARNER: No, Your Honor, because whatever we
> come up with, and I have listened to you carefully
> when you spelled out the legal basis for newly
> discovered evidence and all of that. What is supposed
> to happen within a month that is going to change your
> analysis of newly discovered evidence? I don't
> understand.
>
> *I sympathize with Mr. Harris; truly I do.* But I don't
> see - - I think it's just a parade that every time we
> are delaying, delaying the sentencing. It is clear to
> me what the law says, and you've read the law.
>
> THE COURT: Did you research the law?
>
> ATTORNEY GARNER: Not with respect to newly discovered
> evidence, Your Honor, but it's clear to me based on
> what you've said, that there's no other choice but to
> proceed to sentence Mr. Harris. I don't see why we
> are continuing to delay and delay this sentencing.
> *It's a very, very bad situation, but there's no way
> out of it. At least not at this juncture.*

(*Id.* at 108:1-109:6 (emphasis supplied).) The judge

incredulously responded, "So what you're telling me is you're

not going to pursue this any further?" and proceeded to lecture

both the Garner and Farrelly about their duties to pursue

justice. (*Id.* at 109:19-112:25 ("I am sure that the Government should be just as interested in pursuing justice.").) He gave the parties another month to investigate. (*Id.* at 112:19-112:25.)

Before the third proceeding occurred, Farrelly was approached by Prosecutor Davis and advised that Sorhaindo had expressed doubt about his in-court identification of Harris.[6] (Hr'g Tr., 19:3-19:12, 21:12-21:15, June 28, 2001.) During a January 1998 meeting with Farrelly, a private investigator, and Dr. Solomon Fulero, an expert in human memory with a focus on identifications in criminal cases, Sorhaindo recanted.[7] (*Id.* at 73:21-74:22.) He explained that he had been under a great deal of stress during the trial and that he had made an error when identifying Harris. (*Id.* at 34:10-34:22.) Farrelly moved for a hearing to take testimony regarding the recantation, and for a new trial under Rule 33. Judge Myers denied the motions on June 11, 1998, and scheduled Harris's third and final sentencing proceeding to occur the following week.

---

[6] Sorhaindo approached Davis a mere week after the trial had concluded, but Davis waited at least 15 months to disclose this apparant *Brady* material. *See infra* note 23.

[7] The only evidence Farrelly attached to his March 2, 1998 motion for a new trial was the affidavit of Dr. Fulero, who attested to Sorhaindo's oral recantation at their January meeting. On August 26, 1998, after Farrelly had submitted the motion and the court had denied it, Sorhaindo signed an affidavit swearing to the truth of his recantation.

The third sentencing proceeding, which occurred on June 18, 1998, was perfunctory.  Just as in 1996 and 1997, Farrelly came prepared merely to ask for a hearing, filing a motion for a writ of habeas corpus ad testificandum for the production of Carlos Fleming from a particular correctional facility.  (Sentencing Tr. vol. III, 2:14-2:24, June 18, 1998.)  Unaccompanied by any affidavits, the request was buttressed only by "information and belief," and the judge denied the motion for lack of evidentiary support. (*Id.* at 2:24-3:24.)  Moreover, neither Farrelly nor the judge mentioned Sorhaindo's recantation, seemingly abandoning their responsibility to resolve the significant cloud hanging over the conviction, despite the fact that no hearing on the matter had ever occurred.[8]

The Judge began his remarks with the following:

Let me say this.  I have always expressed my disappointment in the Government and the way things were done in this case.  From the very instance, there was this thing about other persons being involved in this crime, and the truth will eventually get out.

The lead prosecutor is no longer with the office of the Attorney General, and nobody in the Attorney General's office saw it fit to appoint or place someone else on this case to conduct further investigation, so the case has languished.

---

[8] Like other documents related to this case, page 3 of this hearing's transcript has disappeared.  If Sorhaindo's recantation was mentioned there, we would not be aware of it.

> I thought that I have been more than over-generous
> with giving both sides additional time to at least see
> if there are any other persons involved, and to this
> date I have not heard anything from the office of the
> Attorney General.
>
> The saving grace, Mr. Harris, is that according to
> Rule 33 of the Federal Rules of Criminal Procedure and
> our local rules, that basically, you have 2 years from
> today's date to come up with new evidence . . . .

(Sentencing Tr. vol. III, 12:16-13:18.)  Finding solace in the

"safeguards" still at Harris's disposal, the judge pointed

Harris to the hope of a different result in the future.  (*Id.* at

14:24-15:3.)  He continued by explaining the three appellate

courts to which Harris could turn for review of his conviction.

(*Id.* at 15:3-15:10.)  Despite the judge's reservations, he found

sentencing appropriate because "there's got to be a closure."

(*Id.* at 15:11-15:12.)  He sentenced Pedro Harris to four and

one-half years for conspiring to commit murder and life without

parole for the murder itself.  (*Id.* at 15:12-16:1.)

In 2001, Harris again moved for a new trial on the grounds

that Sorhaindo had recanted his testimony, this time providing

an affidavit, signed on August 2, 1998, in which Sorhaindo swore

to the truth of the recantation. (Hr'g Tr., 3:14-5:5, June 28,

2001.)  According to Harris, both this newly discovered evidence

and the interests of justice required that he receive a new

trial.  At the hearing on the Rule 33 motion, Harris's new

attorney called several witnesses,[9] including Sorhaindo, whom all expected to testify that his in-court identification had been a mistake, as he had sworn in his affidavit. While on the stand, Sorhaindo explained that he had approached Prosecutor Davis approximately a week after the trial, and that Davis had questioned him about the validity of his in-court identification. (*Id.* at 19:13-20:8.) He recounted the meeting he attended during which he signed an affidavit acknowledging that he had identified Harris in error. (*Id.* at 26:2-27:1.)

In sum, from September 1996 through June 2001—— a period of nearly five years——Sorhaindo told everyone involved that he had been mistaken about Harris's involvement. But the week before the 2001 hearing took place, however, Sorhaindo spoke to Curtis Griffin, an investigator for the prosecutor's office, and that conversation prompted Sorhaindo to change his story once again—— he had not been mistaken when he made the in-court identification after all. (*Id.* at 31:21-32:6, 37:2-37:5.)

Dr. Fulero, present at the 1998 meeting between Sorhaindo and Farrelly during which Sorhaindo recanted, also testified at the 2001 hearing. He opined that Sorhaindo's initial recantation bore all indicia of reliability. (Hr'g Tr., 74:15-

---

[9] With new counsel, he also finally managed to produce Carlos Fleming to testify on his behalf. (Hr'g Tr., 108:3-108:8, June 28, 2001); *see also supra* note 4.

74:22, 77:1-79:10, 96:22-98:2, June 28, 2001.) Sorhaindo's 2001 in-court testimony expressing certainty that Harris had passed him with three other men on the night of Officer Hodge's murder did not alter Dr. Fulero's view that Sorhaindo's first recantation was genuine. (*Id.* at 99:19-100:12.) Fulero explained the discrepancies between Sorhaindo's demeanor when he first recanted and when he testified in open court in 2001: when he recanted originally, Dr. Fulero found him earnest, "as though this is something he really wanted to get off his chest. . . . [H]e did not hesitate in his answer as he appeared to do today." (*Id.* at 97:7-97:13.)

In its Order resolving Harris's motion for a new trial, the trial court concluded that "Sorhaindo's recantation seems credible." (April 12, 2002 Order, 10.) "Sorhaindo made the decision to seek out the prosecutor with regard to a belief he may have been mistaken at trial[,] . . . met with Harris'[s] attorney and Dr. Fulero, and subsequently attested to his mistaken identification at trial[,] . . . [and e]ven at the hearing on his recantation, he testified that he knew what he was attesting to in his affidavit." (*Id.*) Judge Myers' Order all but labeled the flip-flopping an outright pattern, reminding the reader to "[b]ear in mind that Sorhaindo had previously told police that the four individuals he had witnessed on the night

of the murder were wearing stockings over their faces and that he could not identify any of them." (Apr. 12, 2002 Order, 6.)

Even so, the trial court mechanically applied non-binding precedent to conclude, as a matter of law, that a repudiated recantation could qualify only as impeachment evidence and therefore did not justify a new trial under the test set forth in *Government of the Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir. 1985).

Having exhausted his available remedies in the trial court, Harris appealed to this Court, filing an appellate brief in May 2009 in which he claimed an entitlement to relief on multiple grounds. We need not address the majority of them. Instead, we find three errors——one on the part of the prosecutor, two on the part of the court: (1) Prosecutor Davis's knowing use of false testimony; (2) the trial court's denial of Harris's motions for a new trial on interest-of-justice grounds; and (3) the trial court's decision that, as a matter of law, a repudiated recantation can serve only as impeachment evidence. Any one of these errors would alone merit a new trial. The presence of all three, combined with a detailed examination of the available record, leaves us firmly convinced that a miscarriage of justice has occurred. We accordingly reverse the judgment of conviction and remand for a new trial to occur within 90 days.

## II. JURISDICTION

This Court has jurisdiction over appeals of final judgments or orders that were entered before January 29, 2007. *See* Revised Organic Act of 1954 23A, 48 U.S.C. § 1613(a); Act of Oct. 29, 2004, No. 6687, sec. 6, § 2, 2004 V.I. Legis. 6687 (2004); *see also Joseph v. People of V.I.*, No. 2005-13, 2008 WL 5663569, at *5 (D.V.I. App. Div. 2008).[10]

## III. ANALYSIS[11]

### A. Knowing Use of False Testimony[12]

---

[10]  The Court's jurisdiction to review criminal judgments and orders of the Superior Court is limited to cases in which the defendant has been convicted, and has not entered a guilty plea. *See* V.I. Code Ann. tit. 4, § 33 (2006); 48 U.S.C. § 1613(a) (2006).

[11] This Court has jurisdiction over appeals of final judgments or orders that were entered before January 29, 2007. *See* Revised Organic Act of 1954 23A, 48 U.S.C. § 1613(a); Act of Oct. 29, 2004, No. 6687, sec. 6, § 2, 2004 V.I. Legis. 6687 (2004); *see also Joseph v. People of V.I.*, No. 2005-13, 2008 WL 5663569, at *5 (D.V.I. App. Div. Dec. 9, 2008).

[12] On appeal, Harris alludes to this error by citing binding precedent in support of the proposition that "the prosecution may not knowingly use false evidence[, a]nd if the Government presents false evidence, even unwittingly, a defendant is entitled to a new trial if there is a reasonable probability that without the evidence the outcome of the trial would have been different." (Harris's Appellate Br., 146 (internal quotation marks omitted)). He did not, however, move for a new trial on the specific ground that the prosecutor knowingly used false testimony. But even though he did not adequately advance it, a court of appeals can consider arguments not raised by the party when the error committed below is plain. *See Horne v. Flores*, 129 S. Ct. 2579, 2617 (2009) (dissent) ("[A] basic principle of law that the Court does not mention—a principle applicable in this case as in others—is that, in the absence of special circumstances (*e.g.*, plain error), a judge need not consider issues or factors that the parties themselves do not raise.").

Beginning with its seminal decision in *Mooney v. Holohan*, 294 U.S. 103 (1935), the Supreme Court established that the deliberate deception of the court and jury by the knowing presentation of false evidence violates the due process guarantees of the Fourteenth Amendment.  The Court explained:

> [Due Process] is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.  Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.

*Id.* at 112.  *See also Pyle v. Kansas*, 317 U.S. 213, 216 (1942). Supreme Court decisions in the decades that followed fleshed out the scope of these due process rights and reduced the degree of prosecutorial culpability required to trigger a constitutional transgression.  In *Naupue v. Illinois*, 360 U.S. 264 (1959), for example, the Court held that prosecutorial misconduct sufficient to violate a defendant's due process rights occurs "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id.* at 269.  *See also Giglio v. United States*, 405 U.S. 150, 153-154 (1972).[13] In *United States*

---

[13] After the Supreme Court decided *Napue*, it concluded in *Brady v. Maryland*, 373 U.S. 83 (1963), that suppression of material evidence justified a new trial regardless of whether the prosecution acted in

*v. Agurs*, 427 U.S. 97 (1976), the Supreme Court established that

a prosecutorial misconduct claim may arise when "the undisclosed

evidence demonstrates that the prosecution's case includes

perjured testimony and that the prosecution knew, or should have

known, of the perjury."[14]  *Id.* at 103; *see also Connick v.*

*Thompson*, --U.S.----, 131 S.Ct. 1350, 1381 n.16 (2011) (citing

*Agurs* for the same proposition).

But though the knowing use of false testimony violates due

process, a verdict that follows must fall only if "'the false

testimony could . . . in any reasonable likelihood have affected

the judgment of the jury.'"  *Giglio*, 405 U.S. at 154 (quoting

*Napue*, 360 U.S. at 271).  A successful challenge to a conviction

based on this type of prosecutorial misconduct therefore

---

good or bad faith.  Thereafter, the Supreme Court called upon the due
process principles it articulated in *Napue* and *Brady* to hold in *Giglio*
that constitutionally offensive misconduct had occurred when the
prosecutor, as a result of negligence, presented false evidence
regarding whether the prosecutor's office had agreed to shield a
witness from future prosecution.  *Giglio*, 405 U.S. at 153-54.  In
*Agurs*, the Supreme Court clarified the relationship between cases
similar to *Napue* and *Giglio* and *Brady* itself, calling cases involving
the knowing use of false testimony a subset of *Brady* cases.  *Agurs*,
427 U.S. at 103-04.  We mention the relationship between *Brady* and the
*Napue/Giglio* line of cases because we occasionally cite cases that
build upon the *Brady* framework, mentioning that case by name, but
which, without this background, would not appear relevant to the
constitutional error alleged here.

[14] A witness's testimony need not have been "knowingly false (and hence
perjury)" to succeed on such a claim; rather, a prosecutor's knowing
use of *false* testimony is enough to infringe upon a defendant's right
to due process.  *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001)
(quoting *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995)).

requires the defendant to show that (1) the testimony was
actually false ("falsity element"); (2) the prosecutor knew, or
should have known, it was false ("prosecutorial knowledge
element"); and (3) there is "any reasonable likelihood that the
false testimony could have affected the judgment of the jury"
("materiality element").[15] *Agurs*, 427 U.S. at 103.

Ordinarily, a motion for a new trial based on a *Brady*
violation presents the trial court with both factual and legal
questions.  On appeal, the reviewing court examines the lower
court's factual findings for clear error and its legal
conclusions de novo.  *United States v. Joseph*, 996 F.2d 36, 39
(3d Cir. 1993).  But despite numerous post-trial motions filed
below, Harris did not move for a new trial on the grounds that
Prosecutor Davis knowingly employed Sorhaindo's false testimony.
We, thus, review this prosecutorial misconduct claim for plain
error.  *See United States v. Dozier*, 119 F.3d 239, 244 (3d Cir.
1997), abrogated on other grounds by *Johnson v. United States*,
529 U.S. 694, 699 n.3 (2000).  "Under that standard, a defendant
must establish that there was an error that was plain or

---

[15] In *Agurs*, the Supreme Court did not explicitly set forth the three-
part test outlined here. *See* 427 U.S. at 103.  Instead, it situated a
line of Supreme Court cases that addressed the knowing use of false
testimony within the *Brady* framework, *see supra* note 12, and set forth
the appropriate materiality standard.  *See id.*  That said, many cases
since have cited *Agurs* when discussing the necessary elements of
establishing a knowing-use-of-false-testimony claim.  *See, e.g.,*
*United States v. McCrane*, 575 F.2d 58, 61 (3d Cir. 1978).

obvious, that it affected his substantial rights, and that, if
not rectified, it would seriously affect 'the fairness,
integrity or public reputation of judicial proceedings.'"
*United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010)
(quoting *United States v. Lessner*, 498 F.3d 185, 192 (3d
Cir.2007)).

Because Harris did not explicitly make this argument below,
the lower court did not conduct a direct inquiry into the
factual underpinnings of Harris's prosecutorial misconduct
claim.  We are therefore left with the responsibility of
determining in the first instance whether it is plain or obvious
that (1) Sorhaindo testified falsely and (2) that Prosecutor
Davis knew, or should have known that the testimony was false.
In conducting this inquiry, we are not without guidance,
however, because one of the lower court's factual findings——
though made when faced with a different legal argument[16]——applies
equally here.  Although it did not commit to a full endorsement
of Sorhaindo's recantation, the court found it "credible,"
citing Sorhaindo's decision to seek out Prosecutor Davis,
meeting with Harris's defense team, and signing of an affidavit

---

[16] Below, Harris argued that Sorhaindo's recantation qualified as the
type of newly discovered evidence that should trigger a new trial,
putting the recantation's credibility directly at issue.  We discuss
Judge Myers's resolution of that argument in Section II.C, *infra*.

that he had been mistaken when identifying Harris at trial as evidence of the integrity of the recantation. (April 12, 2002 Order, 10.) "Even at the hearing on his recantation," the court explained, Sorhaindo "testified that he knew what he was attesting to in his affidavit." (*Id.*) By contrast, "there was no articulated rationale behind Sorhaindo's repudiation of his recantation at the hearing [and, a]s such, while the Court c[ould] not say that this witness has necessarily lied at any point in these proceedings, his recantation seems to be more a product of reflective thought than does his repudiation." (*Id.* at 14-15.) As we explain in Section II.C, the trial court's ultimate decision to deny relief turned on a mistaken understanding of the law, not on a decision that the recantation was disingenuous.

Though not articulated explicitly, a second lower court factual determination also aids our inquiry. As the detailed recounting of Harris's sentencing proceedings make clear, Judge Myers found Harris to be a credible witness. The judge eventually determined that none of the arguments presented by Harris's counsel warranted relief, but he did so only after repeatedly postponing Harris's sentencing. And at each sentencing proceeding, Harris's expressions of innocence and questions as to the fairness of the trial process persuaded the

trial judge that further investigation was necessary to

determine whether Harris's guilty verdict could stand.

Unfortunately for Harris, Prosecutor Davis's removal from the

case and his counsel's complete failure to pursue investigative

leads or provide the court with more than "information and

belief" led Judge Myers to conclude that none of the legal

grounds Harris offered were sufficient to grant a new trial.

That said, Judge Myers's reluctance to sentence Harris is

palpable in all three proceedings.

We accept the trial court's factual findings unless they

are clearly erroneous.[17] *United States v. Pierce*, 622 F.3d 209,

210 (3d Cir. 2010). "A finding of fact is clearly erroneous

when, after reviewing the evidence, the court of appeals is

'left with a definite and firm conviction that a mistake has

been committed.'" *Oberti*, 995 F.2d 1204, 1220 (3d Cir. 1993)

((quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985));

*see also United States v. Grape*, 549 F.3d 591, 603 (3d Cir.

2008) (applying *Oberti* standard in criminal case). We defer to

the findings of the trial court unless the record cannot support

---

[17] We review the instant claim of prosecutorial misconduct claim for
plain error because Harris failed to raise it below. The clearly
erroneous standard comes into play only because the trial court made
factual findings that are significantly relevant to the claim now
before us. So long as those factual findings are not clearly
erroneous, they will bear on whether the prosecutor's error was plain
or obvious.

those findings. *Oberti*, 995 F.2d at 1220. This standard of
review is especially applicable to "issues involving assessments
of witness credibility . . . [which] are wrapped up in
evaluations of demeanor that a trial judge is in a better
position to decide."[18] *United States v. Brown*, 631 F.3d 638, 643
(3d Cir. 2011).

The record here plainly supports Judge Myers's finding that
Sorhaindo's recantation was credible. The recantation alone
does not lead us to conclude under the plain error standard that
Sorhaindo testified falsely. *Cf. Brown v. United States*, 556
F.2d 224, 229 (3d Cir. 1977) (Gibbons, J., dissenting) (prior
inconsistent statement of witness not enough to convince
majority that witness testified falsely). But Sorhaindo's
credible retraction, coupled with (1) the two completely
inconsistent narratives he provided regarding how he came to
notice the four men dressed in black on the night of Officer
Hodge's murder; (2) his three initial statements to law
enforcement that he did not see any of the four men's faces; (3)
his failure to pick Harris out of a photo array before trial;
(4) his subsequent failure to identify Mosby in person, despite
having previously identified his photo; and (5) Harris's

---

[18] The trial court received testimony about the circumstances of the
recantation and heard live testimony from Sorhaindo during which he
was unable to explain his about-face.

testimony regarding his non-involvement in the murder compels

the conclusion that Sorhaindo's testimony was, indeed, false.[19]

To grant Harris a new trial, we must also conclude that

Prosecutor Davis knew, or should have known, that Sorhaindo's

testimony was false. *Agurs*, 427 U.S. at 103. For this factual

inquiry, however, we lack any guidance from the lower court in

the form of a related factual finding.

We do not know why Sorhaindo identified Harris, rather than

Mosby, at trial. But we are certain that a reasonable

prosecutor pursuing justice would have recognized the

substantial question arising from Sorhaindo's identification

testimony and would have strongly considered the possibility

that this identification was made in error. Direct evidence

rarely exists as to a person's state of mind; instead, we look

to attendant circumstances. *See United States v. Riley*, 621

F.3d 312, 333 (3d Cir. 2010). Here, the circumstantial evidence

that Davis knew, or should have known, that Sorhaindo made a

mistake abounds: the Government's case against Harris was reed-

thin; Sorhaindo's inconsistent narrative and state of mind

raised questions about his ability to make an accurate

identification; Davis failed to inquire into the

identification's veracity when the opportunity presented itself

---

[19] *See supra* note 13.

at trial; and he subsequently withheld Sorhaindo's recantation

from Harris's counsel in violation of Brady for 15 months.

As an initial matter, without Sorhaindo's identification,

the government's case against Harris lacked persuasive value.

The only evidence the prosecution intended to introduce in order

to convict Harris of murder was that he was in the bathroom of

Mosby's store many hours before Officer Hodge was killed, and a

click, which might have been a gun (but, according to the

witness Daniel, might have been "the sound of anything"), was

heard coming from that direction.  (Trial Tr. vol. 4, 39:24-

40:3.)  Pointedly, the prosecution did not possess nor present

evidence that Harris participated in conversations with Mosby

about the "serious job [they had] to do . . . ."  (*Id.* at 67:8-

67:11.)  The government's anticipated case becomes even less

compelling when one recalls that five men were on trial for a

murder that involved only four types of firearms.

When gifted with Sorhaindo's serendipitous identification,

Davis had abundant reason to question the accuracy and

reliability of identifications made by this witness.  Sorhaindo,

after all, provided two mutually exclusive narratives as to how

he came to notice the men in black walking down the street at

midnight——he was either playing dominos or closing the gate.

(Trial Tr. vol. 2, 26:1-26:18, 71:23-73:16)  His attention was

directed to the four men by either his brother or another

person.  (*Id.*)  These inconsistencies regarding the basic facts

of Sorhaindo's testimony should have raised questions about

whether he provided accurate and reliable testimony.  Second,

the prosecutor was aware that, in his first three statements to

law enforcement officials, Sorhaindo said he did not see the

faces of the men.  (*Id.* at 53:17-53:19, 56:10-56:13)  Moreover,

Prosecutor Davis knew that Sorhaindo had failed to provide

consistent statements to law enforcement officials on the

critical issue of whether the men wore stocking masks, a fact

central to the validity of his identification of Harris.  (Hr'g

Tr., 50:9-50:18, June 28, 2001)  Overlaying these significant

inconsistencies was the fact that the Sorhaindo had failed to

identify Harris in a photograph array, suggesting that he

neither saw nor remembered Harris from the night of Officer

Hodge's murder.  (Trial Tr. vol. 6, 232:20-233:10.)  Finally, in

the same series of questions posed by the prosecutor at trial,

Sorhaindo failed to identify Mosby, whom he had identified

previously, further placing his ability to make a trustworthy

and accurate identification in serious doubt.  (Trial. Tr. vol.

2, 30:21-37:13.)  To be credible, Sorhaindo's identification of

Harris demanded corroboration, and the record contains none.

Such was the status of the prosecutor's case against Harris when
the surprise identification was made.[20]

At the time of the surprise identification, the government
had special knowledge of Sorhaindo's mental state, information
that had not been shared with the defense.[21]  Specifically, on
July 15, 1996, Prosecutor Davis provided Judge Meyers with 33
pages of psychiatric records for the witness and sought an *in
camera review* as to whether the records contained *Brady*
material.[22]  (Gov't's 8th Supp. Resp. to Def.'s Req. for

---

[20] These two elements——the weakness of the prosecution's case and the
circumstances surrounding the first time Sorhaindo made the
identification——distinguish Harris's challenge to Sorhaindo's
credibility from that of co-defendant Gent Mosby.  As we explain in
our contemporaneous opinion in the case of *Gent Mosby v. Government of
the Virgin Islands*, D.C. App. Crim. App. No. 1997-0015-01, when
Sorhaindo was presented with a photo array that included Mosby, he
promptly selected Mosby's photo (Pretrial Hr'g Tr., 51:5-51:11, Apr.
19, 1996) and, when on the stand, re-identified the photo as the one
he had chosen out of the photo line-up earlier in the investigation
(Trial Tr. vol. 2, 35:2-37:12).  In Mosby's case, Sorhaindo's
relatively consistent position made his identification credible.
Moreover, significant additional evidence pointed to Mosby's guilt.

[21] Farrelly's first motion for a new trial complained that "[t]he court
would not allow defendants access to Mr. Sorhaindo's psychiatric
records[, which, b]ased upon Mr. Sorhaindo's testimony . . . bore on
his credibility and would have been important for the jury to
consider." (Def.'s Mot. For a Judgement of Acquital or,
alternatively, Motion for a New Trial (September 9, 1996), 19.)
Pursuing an additional lead, Farrelly also asked for post-trial
discovery of all materials related to Sorhaindo's participation in the
"special education" program while a student within the Virgin Islands
education system.  (Def.'s Req. for Disc. (October 28, 1996), 1.)
Nothing in the record suggests that the Government made this
information available to Harris or his counsel at any point.

[22] The prosecution's request for an in camera review of Sorhaindo's
medical records reads as follows:

Additional Disc. (July 15, 1996), 2.)  At a previous hearing on

July 1, 1996, Davis stated that the stress of the events of the

night of the murder had caused Sorhaindo to seek psychiatric

care.  (Pretrial Hr., July 1, 1996, 36:20-38:14.)  Given the

government's heightened awareness of the witness's mental state,

and its obvious recognition of the importance of Sorhaindo's

ability to make trustworthy identifications, the government

should have evaluated this surprise identification in the full

context of all that it knew about its witness.[23]

The presence of such substantial questions——arising from

countless sources——about Sorhaindo's ability to recall and

accurately articulate what he saw on the night of Officer's

Hodge's murder persuades us that a reasonable prosecutor would

---

Attached hereto please find GVI 8th Supp. Exhibits #3, FILED
UNDER SEAL.  Exhibit #3 constitutes thirty three (33) pages
of medical records related to emergency room treatment and
psychological evaluations conducted on the Government's
witness named Eustace Sorhaindo.  At the July 1, 1996
pretrial hearing, the Court indicated that it would review
the documents and make its ruling on *Brady.*

(Gov't's 8th Supp. Resp. to Def.'s Req. for Additional Disc. (July 15,
1996), 2.)  Also at the July 1, 1996 Pretrial Hearing, Prosecutor
Davis explained that, due to the stress associated with having
witnessed something related to a murder, Sorhaindo had seen several
doctors, at least one of whom was a psychiatrist. (Pretrial Hr., July
1, 1996, 36:20-38:14.)  No ruling on this request appears in the
record.

[23]  A witness's mental state bears on the reliability of any
identification tendered by that witness and we can draw no favorable
inference from Davis's recalcitrance to act in a more responsible
manner.

have known that Sorhaindo had been mistaken when he identified
Harris.  And indeed, an examination of Davis's behavior
following the identification lends strong support to the
conclusion that Davis did, in fact, know of the identification's
falsity.

Almost immediately after the identification occurred, Davis
was presented with an opportunity to adjust course and allow a
full examination into the Sorhaindo's identification abilities.
When Sorhaindo's cross-examination began, Attorney Collanton,
Mosby's counsel, promptly asked if Sorhaindo was under
psychiatric care.  (Trial Tr. vol 2, 43:3-43:4.)  Prosecutor
Davis objected and Judge Myers called a sidebar conference to
discuss whether the question implicated Sorhaindo's
participation in the witness protection program.  (*Id.* at 43:15-
43:20.)  Counsel explained on the record that Sorhaindo "on his
own, went to see [a psychiatrist]" and Collanton wanted to ask
Sorhaindo if "he [wa]s currently still seeing a psychiatrist."
(*Id.* at 43:23-43:25.)  According to Collanton, Sorhaindo
"seem[ed] to be out of it.  He seem[ed] confused."  (*Id.* at
44:2-44:3.)  Attorney Moore, representing Ricky Vanterpool,
wanted to ask Sorhaindo if he was under the influence of drugs
or alcohol because he was "somewhat disoriented" and having "the
appearance of, at least, having some form of medication."  (Id.

at 45-10-21.)  Prosecutor Davis argued vehemently against that

line of questioning, saying "[i]t places in the minds of the

jury that he was under some kind of psychiatric care," and

prevailed.  (*Id.* at 50:8-51:20.)  The defense attorneys'

concerns may have had a factual basis but, unfortunately, this

Court cannot evaluate the import of these medical records as

they, with many other documents that could provide support for

Harris's requested relief, have since disappeared from the

official court record in this matter.

Seven days after the trial ended, Davis received a second

opportunity to right his wrong when Sorhaindo approached Davis

and disavowed his identification.  (Hr'g Tr., 19:3-19:12, 21:12-

21:15, 73:21-74:22, June 28, 2001.)  He said he had made a

mistake.  (*Id.*)  Yet Davis waited at least 15 months to provide

this information to Harris's trial counsel[24] in clear disregard

of a prosecutor's responsibilities under *Brady* to promptly

---

[24] Sorhaindo approached Prosecutor Davis approximately one week after the
trial, i.e., at the end of August 1996.  (April 12, 2002 Order, 10.)  Davis
appeared as counsel for the Government at the November 1996 sentencing
proceeding, but did not mention Sorhaindo's recantation.  (*See* Sentencing Tr.
I.)  Davis appeared as a witness at Harris's November 1997 sentencing
proceeding, but did not mention Sorhaindo's recantation, even when attempting
to establish the plausibility of Harris's innocence given Carlos Flemming's
letters and cooperation with law enforcement.  (*See* Sentencing Tr. II, 21:8-
37:3.)  Farrelly, also trying to establish Harris's innocence at the time
(though without putting forth much investigative effort), did not mention
Sorhaindo's recantation at either the 1996 or 1997 hearings.  (*See* Sentencing
Trs. I & II)  In January 1998, Farrelly finally met Sorhaindo and heard the
recantation in person.  (Hr'g Tr., 73:21-74:22, June 28, 2001.)  Based on the
record before us, we can safely conclude that Davis disclosed Sorhaindo's
recantation to Farrelly sometime between November 21, 1997 and January 25,
1998.

disclose exculpatory evidence. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) (duty to disclose is ongoing and extends to all stages of the judicial process). His conduct does not evince an understanding of the prosecutor's role in ensuring fair process. Though it occurred after the trial concluded, Davis's decision to withhold Sorhaindo's recantation is circumstantial evidence of Davis's state of mind during the trial.

By proceeding throughout the trial and for more than a year afterward as if Sorhaindo's testimony was the bedrock of certainty, Davis behaved recklessly and irresponsibly when the single identification evolved into two. His choices can only be fairly viewed as either deliberate and intentional or willfully blind. These circumstances cried out for caution by the prosecutor, and yet, at every stage in this proceeding, Prosecutor Davis suppressed inquiry into the reliability and accuracy of the identification of Harris. Indeed, no basis existed upon which a reasonable prosecutor could conclude that the identification was truthful, accurate, and reliable such that it could be accepted without careful scrutiny. This willful blindness satisfies *Agurs*'s prosecutorial knowledge element under the plain error standard.

Having determined that a plain or obvious error occurred,

we must determine whether the error had a "substantial and

injurious effect or influence in determining the . . .

verdict."[25] *Kotteakos*, 328 U.S. 750, 776 (1946); *see also United*

*States v. Olano*, 507 U.S. 725, 734-35 (1993) (defendant bears

burden of demonstrating plain error). A review of Prosecutor

Davis's closing argument makes clear that the case against

Harris turned on Sorhaindo's identification. (Trial Tr. vol. 9,

25:20-25:24) Without Sorhaindo's in-court identification,

Prosecutor Davis would have asked the jury to convict Harris

based on Daniel's testimony alone. As we have explained, as a

matter of law such evidence would not suffice to sustain a

conviction, much less one for murder or conspiracy to commit

murder. We accordingly find that Davis's decision to rely on an

identification he should have known was false affected Harris's

substantial rights. *See Jones v. United States*, 527 U.S. 373,

394-95 (1999). Moreover, given our grave doubts that Harris

committed murder, this error, if not rectified "would seriously

---

[25] The *Agurs* materiality standard requires the defendant to establish
"any reasonable likelihood that the false testimony could have
affected the judgment of the jury." *Agurs*, 427 U.S. at 103. Because
the plain error materiality standard mandates that a defendant
overcome a significantly higher threshold to qualify for relief, we do
not address the *Agurs* materiality element explicitly. If we find that
Harris satisfies the plain error materiality standard, we necessarily
conclude that he also satisfies *Agurs*'s third requirement.

affect the fairness, integrity or public reputation of judicial proceedings." *Christie*, 624 F.3d at 567 (internal quotation marks omitted).

Courts have long recognized the special role played by the American prosecutor in the search for truth in criminal trials. *Strickler v. Greene*, 527 U.S. 263, 281 (1999). The prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). As such, he "may prosecute with earnestness and vigor——indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones." *Id.*

Prosecutor Davis's use of testimony that a reasonable prosecutor would have recognized as false and unreliable landed far out of bounds. In pursuing a conviction, Davis trampled upon the due process guarantees of fair process embedded in our Constitution. We find that a plain error occurred and remand for a new trial on this basis.

  B. *Abuse of Discretion in Failing to Grant New Trial*

A determination of whether it should grant a new trial is left to the discretion of the lower court. *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006). Accordingly, courts of appeals typically review a denial of a Rule 33 motion for an abuse of discretion. *United States v. Pelullo*, 14 F.3d 881, 886 (3d Cir. 1994). A trial court abuses its discretion if it makes a clearly erroneous finding of fact, a mistaken conclusion of law, an improper application of fact to law, or if no reasonable person would reach the same decision. *In re Cendant Corp. PRIDES Litigation*, 235 F.3d 176, 181 (3d Cir. 2000). "[W]e will not interfere with the [lower court's] exercise of discretion unless there is a definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (internal quotation marks omitted).

In the first motion for a new trial that Farrelly filed on Harris's behalf (and many times thereafter), he argued that "[t]he interests of justice demand [a new trial] based upon the miscarriage of justice which occurred due to the jury's obvious reliance upon the testimony of Eustace Sorhaindo."[26]  (Def.'s

---

[26] "Rule 33 divides motions for a new trial based on the interest of justice into two different subcategories: (1) motions based on newly discovered evidence; and (2) motions based on 'other grounds.'  The former may be brought within three years of the verdict or finding of guilt, while the latter must be brought within seven days of the

Mot. For a Judgment of Acquittal or, alternatively, Motion for a

New Trial (Sept. 9, 1996), 1.)  The motion continued: "Since the

Court may weigh the credibility of witnesses under Rule 33, and

Mr. Sorhaindo's testimony cannot be deemed credible, this Court

must give Mr. Harris a new trial to ensure that the ends of

justice are served."  (*Id.* at 1-2.)  The motion included many

grounds for a new trial, but devoted a distinct section to the

argument that Sorhaindo's testimony was not credible.  (*Id.* at

11-16.)  The lower court's order contains only two sentences

rejecting this argument:

> Harris'[s] assertion that he is entitled to a new
> trial because Sorhaindo had not previously identified
> him in a photographic array, or had given [] different
> descriptions to enforcement officers is equally
> without merit.  These facts presented questions of
> credibility which the jury obviously decided in favor
> of the Government, and with which this Court does not
> disagree.

(Nov. 12, 1996 Order, 25-26.)  Judge Myers inserted these two

sentences into a paragraph that concluded a section dedicated to

rejecting Harris's challenge to the identification procedures

---

verdict or finding of guilt."  *United States v. Wall*, 389 F.3d 457,
466 (3d Cir. 2004).  We here examine Harris's first motion for a new
trial, cognizant that he must have raised this credibility challenge,
which counts as "other grounds" at that juncture in order to have
timely asked for a new trial on that basis.  Nothing in the trial
court or appellate records suggest that Harris's motion was deemed
untimely, and we accordingly conclude that Harris properly and timely
urged the trial court to grant him a new trial on these other grounds.

employed.  Just after these sentences, the court again returned

to the procedural argument:

> Harris'[s] opportunity to more fully explore any
> inconsistencies in the identification procedure of
> Harris during Sorhaindo's testimony, if any, was
> during cross examination and at trial.  Thus,
> Harris'[s] Motion for a New Trial on the ground that
> the in-court identification procedure was
> unnecessarily suggestive is denied.

(*Id.* at 26.)

Several aspects of the way the trial court reviewed

Harris's argument lead us to conclude that, even under abuse of

discretion review, reversal is required.  First, we take issue

with the court's seeming failure to recognize that Harris's

credibility argument was being offered as a distinct and

independent reason why the court should grant a new trial.  The

court's placement of its cursory conclusion regarding

Sorhaindo's credibility as a basis for granting a new trial in a

section dedicated to procedural error is evidence that the trial

court committed a "clear error of judgment" by conflating

Harris's procedural and substantive arguments.  *See In re*

*Cendant Corp. PRIDES Litigation*, 235 F.3d at 181.

Second, we find the trial court's inquiry into Sorhaindo's

credibility too narrow.  Had the trial court evaluated all of

the record evidence regarding whether Sorhaindo's in-court

identification of Harris was reliable, it would have likely

concluded that the interests of justice required granting a new trial. We agree with the trial court that had Sorhaindo merely failed to identify Harris in a photographic array, but later realized his mistake and made a positive identification, one could reasonably conclude that the positive identification was credible. Similarly, if Sorhaindo had given varied descriptions to law enforcement of the four men he saw on March 26, 1994, but had otherwise told a consistent story and later identified Harris, one could reasonably conclude that the identification was credible. But the facts that appropriately color a determination of Sorhaindo's credibility are not limited to a photo array or varied descriptions of the assailants. As we explained above,[27] *see supra* Section II.A, nothing about Sorhaindo's identification of Harris suggested that it was accurate. It came as a complete surprise to everyone involved, including the prosecutor, and was made by a witness with severe threshold credibility problems. Moreover, no other evidence sufficiently implicated Harris to justify finding Sorhaindo's

---

[27] By referencing the facts relied upon in the prosecutorial misconduct section of this Opinion, we do not suggest that Judge Myers should have divined any of the facts that came to light after he denied Harris's motion for a new trial on November 12, 1996. We nonetheless conclude that, at the time the trial court considered Harris's motion for a new trial, sufficient indicia of Sorhaindo's misidentification existed such that the failure to recognize it was an abuse of discretion by the lower court.

identification worthy of trust in spite of the circumstances surrounding it. To order a new trial, a lower court need not be convinced that the jury reached the incorrect result; rather, it must find a *danger*, albeit a serious one, "that a miscarriage of justice has occurred". *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008). The totality of the circumstances convinces us that the lower court abused its discretion by not recognizing the serious danger that Harris had been denied fair process. *See id.*

Third, the court seemed unaware of its duty under Rule 33 to review the record independently. When faced with a Rule 33 motion, the court must examine the evidence and credibility of the witnesses itself, without viewing the evidence in the light most favorable to the government, and determine whether the interest of justice requires a new trial. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). At bottom, Rule 33 calls upon the trial court to examine the fairness and result of the proceedings in an effort to ensure that convictions are just, reliable and trustworthy and do not offend the court's commitment to justice. The lower court's very brief assessment of Sorhaindo's credibility——limited to noting that it "d[id] not disagree" with the jury——fails to satisfy this significant and independent responsibility as the gatekeeper for the halls of

justice.  *Cf. United States v. DiGenova*, 134 F.2d 466, 468 (3d

Cir. 1943) (trial court committed reversible error where it

shifted responsibility to the jury to determine a question of

law).

We appreciate the gravity of this case.  Police Officer

Hodge's murder altered the St. Thomas community.  But a judge is

bound by the law to appropriately exercise the discretion vested

in him to ensure a just result.  Here, the law required Judge

Myers to fairly consider Harris's Rule 33 motion and examine the

many factors bearing on Sorhaindo's credibility.  His failure to

undertake these tasks was an abuse of his discretion.  Justice

mandates that we grant Harris a new trial.

### C. *Legal Error Regarding Value of a Repudiated Recantation*

In Harris's 2001 motion for a new trial, he argued that

newly discovered evidence——namely, Sorhaindo's recantation——

justified granting him relief under Rule 33.  As with the

several new trial motions that preceded it, Judge Myers denied

Harris's request.  According to the court, because Sorhaindo

repudiated his recantation, the recantation qualified as

evidence that could be used for impeachment purposes only and,

as a result, could not underlie the grant of a new trial.

(April 12, 2002 Order, 10-13.)

Though we typically review the denial of a Rule 33 motion
for abuse of discretion, as explained above, *Pelullo*, 14 F.3d at
886, the lower court's 2002 denial of Harris's new trial motion
rested entirely upon a question of law.  "To the extent we are
reviewing a legal rather than discretionary decision of the
[trial court], we will apply a de novo standard of review."
*United States v. Quiles*, 618 F.3d 383, 390 (3d Cir. 2010); *see
also United States v. Rashid*, 375 F. App'x 199, 201 (3d Cir.
2010) ("A district court's denial of a motion for a new trial
ordinarily is reviewed for an abuse of discretion, but legal
issues raised by the motion are reviewed de novo." (citing
*United States v. Jasin*, 280 F.3d 355, 360 (3d Cir. 2002)).

Here, the lower court stated the appropriate legal
standard.  Third Circuit case law makes clear that five
requirements must be met before a trial court may grant a new
trial on the basis of newly discovered evidence:

> (a) the evidence must be in fact newly discovered,
> i.e. discovered since trial; (b) facts must be alleged
> from which the court may infer diligence on the part
> of the movant; (c) the evidence relied on must not be
> merely cumulative or impeaching; (d) it must be
> material to the issues involved; and (e) it must be
> such, and of such nature, as that, on a new trial, the
> newly discovered evidence would probably produce an
> acquittal.

*Lima*, 774 F.2d at 1250 (quoting *United States v. Iannelli*, 528
F.2d 1290, 1292 (3d Cir. 1976)).  As the trial court explained,

there was no dispute regarding the first or second elements.

(April 12, 2002 Order, 8.)  But as to the third, the court held

as matter of law that a repudiated recantation is "merely

impeaching," and therefore did not constitute an appropriate

basis for the grant of a new trial.[28]  (*Id.* at 10.)   The court

further noted that several jurisdictions had found repudiated

recantations more than merely impeaching, as had many dissenting

judges, but concluded that these cases failed to support

granting Harris a new trial because they included only dicta or

were distinguishable on the ground that "the witnesses in those

cases turned out to have serious credibility issues."[29]  (*Id.* at

12 (citing, among others, *United States v. Battle*, 25 F.3d 1050

(table) (6th Cir. 1994); *United State v. Davis*, 960 F.2d 820,

825 (9th Cir. 1992); *United States v. Taglia*, 922 F.2d 413 (7th

---

[28] At the time, no Third Circuit precedent existed to directly support the court's decision and rationale.  Instead, the court relied upon a set of wholly distinguishable cases and an unpublished opinion in a District of the Virgin Islands case captioned *Government v. Blyden*, which this Court has not had the opportunity to review because of its unrecognizable citation.  (*Id.* at 11-12 (citing *United States v. Miller*, 987 F.2d 1462 (10th Cir. 1993); *United States v. Badger*, 983 F.2d 1443 (7th Cir. 1993); *Lindsay v. United States*, 368 F.2d 633, 636 (9th Cir. 1966); *Blodgett v. United States*, 161 F.2d 47 (8th Cir. 1947).

[29] It is unclear why credibility provides the grounds by which the trial court distinguished these cases from Harris's.  In the very same order, the court found Sorhaindo's recantation, but not his repudiation, credible and reminded the reader of Sorhaindo's flip-flopping tendencies.  We consider Sorhaindo's behavior sufficiently indicative of serious credibility problems.

Cir. 1991); *United States v. Ramsey*, 726 F.2d 601 (10th Cir.
1984 (McKay, J., dissenting)).

We question the soundness of the trial court's decision to
construe several non-binding cases as creating a *per se* rule
against new trials when faced with a repudiated recantation,
especially in light of myriad cases suggesting otherwise. But
we need not reach that conclusion in a vacuum. In 2010, the
Third Circuit held that, in some circumstances, impeachment
evidence alone is enough to justify granting a Rule 33 motion on
interest-of-justice grounds. *Quiles*, 618 F.3d at 391-92. In
doing so, it relied heavily on the Seventh Circuit's explanation
in *Taglia*, 922 F.2d 413, one of the very cases that the trial
court rejected as distinguishable:

> [Statements by other courts] that new trials should
> not be granted on the basis of newly discovered
> impeachment evidence cannot "be taken at face value.
> Nothing in the text or history of Rule 33 . . .
> supports a categorical distinction between types of
> evidence; and we cannot see the sense of such a
> distinction. If the government's case rested entirely
> on the uncorroborated testimony of a single witness
> who was discovered after trial to be utterly unworthy
> of being believed because he had lied consistently in
> a string of previous cases, the district judge would
> have the power to grant a new trial in order to
> prevent an innocent person from being convicted. The
> 'interest of justice,' the operative term in Rule 33,
> would require no less . . . .
>
> The judicial language that seems to exclude impeaching
> testimony from the scope of Rule 33 thus illustrates
> the tendency to overgeneralize. It is easy to confuse
> a practice with a rule. The practice has been to deny

> new trials where the only newly discovered evidence
> was impeaching. But the practice should not be taken
> to imply a rule that even if the defendant proves that
> his conviction almost certainly rests on a lie, the
> [d]istrict judge is helpless to grant a new trial.
> District judges do not in fact consider themselves
> helpless in such circumstances, and they are right not
> to.

*Quiles*, 618 F.3d at 391 (quoting *Taglia*, 922 F.2d at 415-16).

The Third Circuit cautioned, however, that "newly discovered

evidence that is *merely* impeaching is unlikely to reveal that

there has been a miscarriage of justice." *Quiles*, 618 F.3d at

392. But so long as there is "a factual link between the heart

of the witness's testimony at trial and the new evidence,

[which] suggest[s] directly that the defendant was convicted

wrongly," then the evidence qualifies as more than merely

impeaching. *Id.*

   "[A]n intervening decision from a superior court changes

the controlling law." *Beazer East, Inc. v. Mead Corp.*, 525 F.3d

255, 263 (3d Cir. 2008). Thus, though not in conflict with

Third Circuit precedent when he issued his opinion in 2002,

Judge Myers's interpretation of Rule 33's parameters is now

definitively incorrect. And under this new standard,

Sorhaindo's recantation, which related specifically to the very

evidence supporting Harris's conviction, qualifies as more than

impeaching, even if it was subsequently repudiated. It

accordingly meets *Lima*'s third requirement.  *Lima*, 774 F.2d at 1250.

Sorhaindo's recantation also satisfies *Lima*'s fourth and fifth elements.  *Lima*, 774 F.2d at 1250.  The recantation is certainly "material to the issues involved," going to the very heart of Harris's guilt or innocence——Sorhaindo's identification of Harris was the only real evidence that Prosecutor Davis presented tying Harris to the crime. *See id.*  And, Sorhaindo's recantation of his key testimony, even if subsequently repudiated, would "probably produce an acquittal."  Though the jury heard some evidence of Sorhaindo's inconsistent recollection of the events of March 26, 1994, Farrelly was unable to shake Sorhaindo's insistence that he had seen Harris on the night of the murder during cross-examination.  Evidence of a recantation would permit Harris's counsel to impeach Sorhaindo on the most salient and relevant aspect of his testimony.  As the Ninth Circuit explained in *Davis*:

> In some situations . . . , the newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness'[s] testimony totally incredible. In such a case, if the witness'[s] testimony were uncorroborated and provided the only evidence of an essential element of the government's case, the impeachment evidence would be "material" . . . .

960 F.2d at 825; *see also Napue*, 360 U.S. at 270 (rejecting argument that whenever a witness is impeached in one manner, any

other impeachment becomes immaterial); *Lambert*, 633 F.3d at 135

(finding a *Brady* violation where prosecution's failure to turn

over an inconsistent statement allowed argument that, despite

inconsistencies in witness testimony, witness had always

identified same individuals); *United States v. Perdomo, 929 F.2d

967*, 969, 972 (3d Cir. 1991) (rejecting the district court

finding "that the jury had an opportunity to evaluate the

informant's credibility from other damaging testimony" and

concluding that "[w]hether or not the jury has had an

opportunity to consider other impeachment evidence is not the

correct standard for determining materiality of undisclosed

information").

 The lower court based its decision to deny a new trial on

an uncertain legal principle that has since been rejected by the

Third Circuit. We conclude that in the context of these

proceedings, Sorhaindo's recantation, repudiated or not,

qualifies under *Lima* as the type of newly discovered evidence

for which Rule 33 relief is available. To evaluate Sorhaindo's

credible recantation under the proper legal standard and

conclude that Harris nonetheless did not merit a new trial would

be a clear error of judgment. *See In re Cendant Corp. PRIDES

Litigation*, 235 F.3d at 181. We, accordingly, grant a new trial

on the additional grounds that Sorhaindo's recantation unquestionably changes the landscape of the case against Harris.

## IV. CONCLUSION

Pedro Harris has been incarcerated for sixteen years, the large majority of his adult life.  Over this period of time, his case has progressed in hesitating fashion through the courts. Having accorded the utmost respect to the standards of review that we are required to apply, we find reversible error in the prosecutor's knowing use of false testimony and the trial court's failure to act in a manner consistent with its obligations to fairly review the post-trial motions before it.

We do not reach this decision lightly.  Our sense of justice mandates that we vacate the judgment of conviction of the Territorial Court and remand for a new trial.

An appropriate Order follows.